Hillsborough
No. 91-310

### THE STATE OF NEW HAMPSHIRE

v.

### LEO PARIS

June 30, 1993

*John P. Arnold*, attorney general (*Geoffrey J. Ransom*, attorney, on the brief and orally), for the State.

*Robert J. Moses*, of Amherst, by brief and orally, for the defendant.

HORTON, J.   The defendant, Leo Paris, was convicted in Superior Court (*Groff*, J.) of felony criminal mischief, RSA 634:2, II(a) (Supp. 1992), and felonious use of a firearm, RSA 650-A:1 (1986). On appeal, the defendant raises several arguments, which may be summarized as follows: that there was insufficient evidence to convict him of felony criminal mischief; that the trial court erred in allowing the State to amend its witness list; that the trial court erred in refusing his request for a jury nullification instruction; and that his convictions for felony criminal mischief and felonious use of a firearm subjected him to double jeopardy. We reject these arguments and affirm.

At approximately 1:00 a.m. on July 13, 1989, John Carroll was driving through Manchester when a car driven by the defendant came to a stop in the center of the road. The defendant, who had been returning home from a Manchester lounge, waited until Carroll pulled up behind him, and then proceeded for several blocks before again coming to a complete stop in the center of the road. Carroll again stopped his car, and the defendant again drove away.

After this sequence of events was repeated several more times, Carroll resolved to obtain the license plate number of the defendant's car and report the incident to the police. He followed the car until it turned into the driveway of the defendant's home on St. James Avenue in Manchester. As Carroll passed the driveway, the defendant got out of his car and aimed a .32 caliber pistol at Carroll's car, a 1987 Ford Tempo. When Carroll ducked his head below his dashboard, he heard a bullet strike his car. The defendant fired six or

seven additional shots as Carroll drove away from the defendant's home.

While attempting to return to the main roadway, Carroll, who was unfamiliar with the defendant's neighborhood, inadvertently followed a street that brought him directly behind the defendant's home. The defendant saw Carroll's car and again opened fire, this time using a .25 caliber pistol that he had retrieved from his car after emptying the .32 caliber pistol. The defendant's shooting left several bullet holes in Carroll's car and flattened two tires. The defendant did not deny that he intended to fire at, and hit, Carroll's car. He claimed, however, that he fired in self-defense, with the objective of "blow[ing] out [Carroll's] tires . . . so he wouldn't come back."

The defendant was arrested and indicted for felony criminal mischief and felonious use of a firearm. Under the criminal mischief statute, a party is guilty of a misdemeanor if he purposely or recklessly damages the property of another. *See* RSA 634:2, I & III (1986). The crime is treated as a class B felony if the party purposely causes or attempts to cause pecuniary loss exceeding $1,000. RSA 634:2, II(a) (Supp. 1992). At trial, the State, to establish the amount of pecuniary loss, called as a witness Leo Brosseau, an estimator of damaged vehicles who had inspected Carroll's car two days after the shooting. At his insurance company's request, Carroll had brought his car to Brosseau to obtain an independent estimate of the car's damage. Brosseau estimated that the labor and materials required to repair the car would cost $1,771.36. This sum did not include the cost of replacing the two damaged tires. Carroll received an insurance benefit payment totaling $1,705.45. An acquaintance of Carroll's performed the repair work at a discounted price, and Carroll did not spend the entire amount on repair work. He testified that he used the "majority" of the funds to pay for the repairs.

As further evidence of the damage to Carroll's car, the State produced the detective and police officers who examined the car after the incident. The State also called a firearms expert, who testified that two of the car's tires had sustained bullet holes. Finally, the State introduced photographs showing damage caused by the shooting to Carroll's car. Based on this evidence, the jury convicted the defendant of felony criminal mischief and felonious use of a firearm.

*I. Pecuniary Loss*

On appeal, the defendant first argues that the State failed to prove that he caused or attempted to cause a pecuniary loss in excess of $1,000. According to the defendant, Carroll's pecuniary loss within

the meaning of RSA 634:2, II(a) (Supp. 1992) constituted only the net, out-of-pocket expenses incurred as a direct result of the shooting. The State's evidence, the defendant contends, failed to establish that Carroll spent more than $1,000 to repair damage caused by the shooting.

■■ To prevail on this argument, the defendant must demonstrate that no rational trier of fact, viewing the evidence most favorably to the State, could have found a pecuniary loss exceeding $1,000. *See State v. Amell*, 131 N.H. 309, 311, 553 A.2d 286, 288 (1988). Although the State must prove each element of its case beyond a reasonable doubt, it may fulfill its burden by relying on circumstantial evidence. *See id.*

■ RSA 634:2, II(a) (Supp. 1992) does not define "pecuniary loss." The term, however, generally has been defined as the "loss of money, or of something by which money or something of value may be acquired." BLACK'S LAW DICTIONARY 1131 (6th ed. 1990). When the State must prove the value of property in order "to bring a crime within the ambit of a particular criminal statute, any evidence from which the trier of fact can reasonably infer value is admissible." *State v. Hammell*, 128 N.H. 787, 790, 519 A.2d 307, 309 (1986) (quotation omitted); *cf.* RSA 637:2, V(a) (Supp. 1992) (term "value" under theft statute "means the highest amount determined by any reasonable standard of property or services"). The evidence need not be infallible, *Hammell*, 128 N.H. at 790, 519 A.2d at 309, since determining the weight given a particular piece of evidence "is the very essence of a jury's function." *Id.* (quotation omitted); *see also State v. Pierce*, 231 Neb. 966, 975, 439 N.W.2d 435, 442 (1989) ("there is no universal and comprehensive formula or method to determine the extent of pecuniary loss in relation to criminal mischief").

■ To establish the value of the damage to Carroll's car, the State introduced Brosseau's estimate that repairing Carroll's car would cost $1,771.36, well over the threshold amount for a felony conviction under RSA 634:2, II(a) (Supp. 1992). Insurance estimates have provided the basis for past felony convictions under this statute. *See State v. Robidoux*, 125 N.H. 169, 171, 480 A.2d 67, 69 (1984) (insurance adjuster's estimate provided evidence of "pecuniary loss" over $1,000). Evidence that Carroll's insurer paid $1,705.45, an amount exceptionally close to Brosseau's estimate, lent credibility to the accuracy of the estimate. In addition, the jury saw photographs, and heard testimony, detailing the damage caused by the defendant. The defendant had ample opportunity to challenge the credibility of

the State's evidence on cross-examination. We find that based on this evidence, the jurors reasonably could have concluded that the shooting caused pecuniary loss greater than $1,000.

The defendant also argues that property damage does not constitute a pecuniary loss under RSA 634:2, II(a) (Supp. 1992), if a victim receives insurance to cover the cost of repairing the damage. Under this interpretation, the statute would cover only the narrow category of cases where pecuniary losses were incurred by uninsured or underinsured victims. We cannot conceive that the legislature intended this result. RSA 634:2, II(a) (Supp. 1992) does not require a loss specific to the victim. Rather, it requires only a general pecuniary loss, which could be absorbed by the victim, the insurer, or a combination of the two. The $1,000 pecuniary loss provision in the statute provides a means of grading the severity of a crime; it should not allow defendants to rely on factors unrelated to their conduct— *i.e.*, the existence or amount of their victims' insurance—to limit their criminal liability.

The defendant further argues that the State failed to prove beyond a reasonable doubt that he *intended* to cause more than $1,000 in pecuniary losses. According to the defendant, felony criminal mischief is a specific intent crime requiring the State to do more than simply show that the defendant purposely caused damage. The defendant contends that to elevate the crime to a class B felony, the State had to prove beyond a reasonable doubt that he acted with the specific intent to cause more than $1,000 in damage. We do not agree that the State must provide such proof to sustain a conviction for felony criminal mischief. RSA 634:2, II(a) (Supp. 1992) enhances the crime of criminal mischief from a misdemeanor to a class B felony if the State proves that the defendant purposely caused or attempted to cause pecuniary loss. The State must also prove that the amount of pecuniary loss exceeded $1,000. The intent requirement under RSA 634:2, II(a) (Supp. 1992) relates to the causation, not the amount, of pecuniary loss.

Our interpretation of RSA 634:2, II(a) (Supp. 1992) finds support in the 1969 "Report of Commission to Recommend Codification of Criminal Laws." The comments to what is now RSA 634:2 state that "[t]he grading of this offense is based upon considerations of seriousness similar to those that govern theft offenses, namely, the amount of property lost, and upon the seriousness as measured by effects on essential public services." Theft is divided into different grades of offenses by RSA 637:11 (1986 & Supp. 1992). The statute contains no

intent requirement, and value is one factor that governs the seriousness of the offense.

█ In the present case, the evidence supported the jury's finding that the defendant, in firing seven or eight rounds at Carroll's car, purposely caused pecuniary loss. The amount of this loss simply established the grade of the defendant's offense. *See Pierce*, 231 Neb. at 971-72, 439 N.W.2d at 440. The State did not have to prove that the defendant intended to cause the amount of pecuniary loss needed to enhance the crime to a class B felony.

## II. *Amendment to Witness List*

In addition to challenging the sufficiency of the State's evidence, the defendant contends that the trial court erred by allowing the State to amend its witness list during trial to permit an expert witness, Leo Brosseau, to testify. Prior to trial, the trial court directed the parties to submit "the names and addresses of all witnesses expected to testify and a list of all exhibits to be offered." The State did not disclose Brosseau or his damages estimate. At trial, the State attempted to establish the value of the damage to Carroll's car by questioning Carroll about Brosseau's estimate, and about the amount of payment he received from his insurer. When the trial court sustained the defendant's objection to this questioning, the State requested permission to call Brosseau. The State explained that it had not earlier disclosed Brosseau or his estimate because it had intended to rely on Carroll and his insurance company to establish the value of the damage to Carroll's car. Over defense counsel's objection, the trial court allowed Brosseau to testify, noting that the defense knew that the value of pecuniary loss was an element of the criminal mischief charge, and that the defense "probably assumed . . . [that the amount of loss] was going to be proven by testimony of just somebody like Mr. Brosseau . . . ."

█ On appeal, the defendant argues that the State failed to identify Brosseau before trial, and failed to provide the defendant with a copy of Brosseau's estimate, as required by Superior Court Rule 98. As an initial matter, we note that Rule 98, which concerns evidence the State has obtained from a defendant and intends to use at trial, has no application to this case. The State did not obtain Brosseau's estimate from the defendant, and this evidence never belonged to the defendant. Notwithstanding the defendant's misplaced reliance on Rule 98, even if the defendant were to argue that the State had a duty by analogy to Superior Court Rule 62(I), applicable to civil

cases, to indicate its intended use of Brosseau and his estimate, the argument would not avail him. Under Rule 62(I), "[e]xcept for good cause shown, no witness not listed in the pretrial stipulation or statement will be allowed to testify, and no exhibit, not so listed, will be received in evidence."

The "discovery of truth in the context of a criminal trial . . . should not suffer by an overly technical application of rules of court." *State v. Comtois*, 122 N.H. 1173, 1175, 453 A.2d 1324, 1325 (1982). The admissibility of evidence is generally a matter within the sound discretion of the trial court. *See State v. Nadeau*, 126 N.H. 120, 124, 489 A.2d 623, 626 (1985). We will not reverse the trial court's decision to admit evidence despite noncompliance with discovery rules, unless the decision constitutes an abuse of discretion. *Id.* Evidence that the prosecution made a good faith effort to comply with discovery is one factor that guides the trial court's decision. *Id.* at 124–25, 489 A.2d at 626.

We do not find that the trial court abused its discretion in allowing the State to call Brosseau as a witness. The State concedes that Brosseau's name was not on its witness list, and that it had not supplied the defendant with a copy of Brosseau's estimate before trial. The State, however, did not withhold this evidence to gain a strategic advantage. *Cf. State v. Arthur*, 118 N.H. 561, 563, 391 A.2d 884, 885 (1978) (prosecutor's deliberate delay in complying with court-ordered discovery, for purpose of making evidence less useful to accused, did not necessarily warrant "a new trial or the drastic remedy of reversal"). The State had not anticipated using Brosseau's testimony or his estimate, and it turned to this evidence only after learning that it could not rely on Carroll or his insurer to establish the value of the damage to Carroll's car. Moreover, the trial court could reasonably have concluded that allowing Brosseau's testimony and his damage estimate would not unfairly prejudice the defendant. The defendant knew that the State had to prove the value of the damage to Carroll's car. Although the defendant had not known of Brosseau's damage estimate before trial, he had obtained a letter from Carroll's insurance company indicating that it paid a $1,705.45 claim to cover the estimated amount of damage to Carroll's car. Additionally, the defendant did not request a continuance to prepare for cross-examination of Brosseau, whose testimony was based in large part on price listings in motor vehicle parts manuals and could have been challenged through reasonable efforts by the defense.

The defendant also argues that Brosseau's estimate was irrelevant because it did not mirror the amount of coverage provided by Car-

roll's insurer, or the amount Carroll actually paid to repair his car. Whether evidence is relevant, and thus admissible, is within the discretion of the trial court. *See Hammell,* 128 N.H. at 789, 519 A.2d at 308. As discussed above, Brosseau's estimate was circumstantial evidence of the amount of Carroll's pecuniary loss. This evidence did "not have to be infallible to be admissible." *Id.* at 790, 519 A.2d at 309 (quotation omitted). Weaknesses in this evidence, such as the discrepancy between the estimate to repair and the amount paid to Carroll for his loss, and the amount paid by Carroll to effect the repairs, were "a matter of defense" affecting the weight, not the admissibility, of the evidence. *Id.* at 790–91, 519 A.2d at 309 (quotation omitted).

▮▮ The defendant also argues that he was unfairly prejudiced by the admission of Brosseau's estimate. He contends that the estimate was nothing more than "a general calculation which falls into the realm of speculation," and that its admission unfairly influenced the jury. The determination as to whether the probative value of relevant evidence is substantially outweighed by its prejudicial effect is a matter within the trial court's discretion. *See State v. Trainor,* 130 N.H. 371, 375, 540 A.2d 1236, 1239 (1988). To show that the trial court abused its discretion, the defendant must "demonstrate that the discretionary ruling [was] clearly untenable or unreasonable to the prejudice of his case." *State v. Cochran,* 132 N.H. 670, 672, 569 A.2d 756, 757 (1990). "[T]he prejudice required to predicate reversible error is an undue tendency to induce a decision against the defendant on some improper basis." *Id.*

▮ In this case, the trial court's decision to admit Brosseau's estimate was not "unreasonable or untenable." As discussed above, estimates have provided the basis for past felony convictions under RSA 634:2, II(a) (Supp. 1992). *See Robidoux,* 125 N.H. at 171, 480 A.2d at 69. In addition, while Brosseau's calculation of damage was an estimate, not a factual certainty, a witness qualified as an expert may provide opinion testimony as to scientific, technical, or other specialized knowledge that will assist the trier of fact. *See* N.H. R. Ev. 702. The trial court did not abuse its discretion in finding that Brosseau's estimate would assist the jury in determining whether the amount of damage to Carroll's car triggered the felony enhancement provision of RSA 634:2, II(a) (Supp. 1992).

*III. Qualification of Expert*

▮▮ The defendant next contends that the State did not establish Brosseau's qualifications as an expert. The party offering the

witness as an expert carries the burden of establishing the witness's qualifications. *See State v. Coleman*, 133 N.H. 713, 715, 584 A.2d 755, 757 (1990). The trial court has wide discretion in admitting or excluding an expert opinion, and we will not reverse its decision unless we find a "clear abuse of discretion." *Tullgren v. Phil Lamoy Realty Corp.*, 125 N.H. 604, 609, 484 A.2d 1144, 1148 (1984).

In the present case, the trial court did not err in finding Brosseau qualified to testify. First, the State provided ample evidence attesting to Brosseau's qualifications to testify as to the estimated value of the damage to Carroll's car. Brosseau had worked in the auto body field for approximately twenty-seven years. When he examined Carroll's car, Brosseau was specifically employed as an estimator of damaged vehicles, a position requiring him to appraise between ten and twenty vehicles each day. Brosseau had earlier been qualified in a Massachusetts district court to give expert testimony as to motor vehicle damage. The trial court was justified in concluding that Brosseau was "uniquely qualified" to testify on the cost of repairing damage to automobiles. Moreover, we have already found Brosseau's estimate probative of the cost of repairing Carroll's car. Thus, we reject the defendant's claim that Brosseau's testimony would not assist the jury in determining the amount of pecuniary loss.

*IV. Jury Nullification Charge*

The defendant contends that the trial court erred in refusing his request for a jury nullification charge. Such a charge is used to inform the jury of its "historical prerogative" to acquit a defendant even if the verdict is contrary to the law and the facts of the case. *State v. Brown*, 132 N.H. 520, 526, 567 A.2d 544, 548 (1989). Here, the defendant was not entitled to a nullification charge as a matter of law, and it was within the trial court's discretion to decide whether such an instruction was warranted. *See id.* at 527, 567 A.2d at 548. The defendant argues, however, that the trial court should have stated on the record the grounds for its refusal to give a nullification charge.

We find that the trial court adequately responded to the defendant's request for a nullification charge when it noted that it was prepared to give the jury a so-called "reasonable doubt *Wentworth* Charge." *See State v. Wentworth*, 118 N.H. 832, 838–39, 395 A.2d 858, 860 (1978) (setting forth model jury charge on burden of proof, presumption of innocence, and reasonable doubt). The trial court instructed the jurors that "if you find that the State has proven all of

the elements of the offense charged beyond a reasonable doubt, you *should* find the defendant guilty." We have recognized that use of the term "should" in a *Wentworth* charge provides "the equivalent of a jury nullification instruction," in that the jurors are notified that they may acquit the defendant even if the State proved beyond a reasonable doubt each element of the offenses charged. *Brown*, 132 N.H. at 527, 567 A.2d at 548 (quotation omitted). In this case, a more specific response to the defendant's request was not required. *See id.*

*V. Double Jeopardy*

The defendant finally argues that his conviction for felony criminal mischief and felonious use of a firearm subjected him to multiple punishments for the same offense, in violation of the guarantees against double jeopardy in the New Hampshire and United States Constitutions.

In accord with *State v. Ball*, 124 N.H. 226, 471 A.2d 347 (1983), we first address the defendant's State constitutional claim. Under the double jeopardy clause of the New Hampshire Constitution, *see* N.H. CONST. pt. I, art. 16, the legality of a defendant's indictment for separate crimes stemming from the same incident depends on whether "proof of the elements of the crimes *as charged* will in actuality require a difference in evidence." *State v. Stratton*, 132 N.H. 451, 454, 567 A.2d 986, 988 (1989) (quotation omitted). We have adopted this "difference in evidence" test as "the benchmark for evaluating double jeopardy claims under the New Hampshire Constitution." *Id.*

In essence, the defendant contends that because proof of the elements of felony criminal mischief and felonious use of a firearm, as charged and in actuality, required no difference in evidence, his conviction for both crimes subjected him to double jeopardy. He argues that support for his argument lies in our decision in *Heald v. Perrin*, 123 N.H. 468, 473–74, 464 A.2d 275, 278 (1983), where we held that Heald's convictions for robbery while armed with a deadly weapon and for felonious use of a firearm violated double jeopardy. We held that where use of a gun triggers a statute's enhancement provision, felonious use of a firearm "cannot *also* be charged for commission of the same felony with the same gun because the elements of neither crime will require a single difference in evidence at trial." *Id.* at 474, 464 A.2d at 278 (emphasis in original). We were careful to caution against interpreting our holding too broadly and noted that "felonies which themselves are not enhanced because of the defendant's use of

a gun are also not likely to run afoul of the double jeopardy prohibition." *Id.* at 474, 464 A.2d at 279.

The case at hand concerns two statutory enhancements. The first is RSA 634:2, II(a) (Supp. 1992), which elevates the offense of criminal mischief from a misdemeanor to a class B felony where the "actor purposely causes or attempts to cause pecuniary loss in excess of $1,000." The second enhancement is RSA 650-A:1 (1986), which provides a second class B felony penalty for commission of a felony when armed with a firearm. A literal reading of *Heald*, without regard to our express caution in that case, would tend to support the defendant's argument. We must assess his argument, however, in the context of two later cases that further develop the "difference in evidence" standard.

In *State v. Elbert*, 128 N.H. 210, 512 A.2d 1114 (1986), we affirmed a defendant's convictions for attempted murder and for felonious use of a firearm, even though the murder attempt was perpetrated through use of a firearm. *Id.* at 210, 512 A.2d at 1115. In *Elbert*, the same evidence was used to prove the elements of the two crimes, as charged, but there was only one statutory enhancement, arising by virtue of the felonious use of a firearm. *Id.* We distinguished *Heald* as involving multiple penalty enhancements based on the same evidence; Heald's use of a gun not only enhanced the robbery offense to a class A felony, but it also allowed the imposition of a cumulative sentence under the felonious use statute. *See id.* at 214, 512 A.2d at 1116. In a second case, *State v. Houtenbrink*, 130 N.H. 385, 539 A.2d 714 (1988), we applied the "difference in evidence" standard of *Heald*, as developed in *Elbert*, and held that the defendant's convictions for first degree assault and for felonious use of a firearm violated double jeopardy. *Id.* at 392, 539 A.2d at 719. In *Houtenbrink*, the defendant's use of a firearm had already enhanced the underlying crime of assault to a class A felony. *Id.* We found unconstitutional the further enhancement for felonious use of a firearm. *Id.*

It is clear from *Elbert* and *Houtenbrink* that in cases involving multiple penalty enhancements, the double jeopardy analysis turns on the requirements of the enhancement statutes. As we stated in *Houtenbrink*:

> "[I]f the underlying criminal statute has an enhancement provision for firearm use, which was charged in *Heald*, then a further enhancement for the felonious use of a firearm will be a double jeopardy violation. However, if the underlying criminal statute does not have an enhancement provision for use of a firearm, then an enhancement for the felonious use

of a firearm does not result in a double jeopardy violation. The legislature may twice punish a defendant for the same act, and the decision to punish a defendant more severely if he uses a firearm in the commission of a felony is a permissible legislative decision."

*Id.* at 392, 539 A.2d at 719 (citations omitted).

■ In this case, only one penalty enhancement, RSA 650-A:1 (1986), turned on the defendant's use of a firearm. The enhancement provision in the underlying criminal mischief statute, RSA 634:2, II(a) (Supp. 1992), was triggered not by use of a firearm, but by purposely causing pecuniary loss exceeding $1,000. We find that the defendant's convictions for both crimes did not run afoul of the double jeopardy clause of the New Hampshire Constitution.

■ The defendant's double jeopardy argument under the Federal Constitution requires a different analysis. The double jeopardy clause of the fifth amendment provides three protections: "It protects against a second prosecution for the same offense after acquittal. It protects against a second prosecution for the same offense after conviction. And it protects against multiple punishments for the same offense." *Grady v. Corbin,* 495 U.S. 508, 516 (1990) (quotation omitted). The defendant's claim in the present case concerns the third category of protections.

■ Although the fifth amendment prohibits multiple punishments for the same offense, a single transaction can give rise to multiple, distinct offenses without violating the double jeopardy clause. *See Albernaz v. United States,* 450 U.S. 333, 344 n.3 (1981). Where the same conduct violates two statutory provisions, "the touchstone of whether the double jeopardy clause is violated . . . is the legislature's articulated intent. . . ." *State v. Bailey,* 127 N.H. 811, 814, 508 A.2d 1066, 1069 (1986). If the legislature's intent to impose multiple punishments is clear from the face of a statute, or from the legislative history, the punishments will not violate the double jeopardy clause. *See Missouri v. Hunter,* 459 U.S. 359, 368–69 (1983). We have expressly found that the New Hampshire Legislature "clearly intended to authorize the imposition of separate sentences" where a defendant's conduct both triggers the enhancement provisions in an underlying criminal statute, and satisfies the elements of the felonious use of a firearm statute. *Heald,* 123 N.H. at 471, 464 A.2d at

276. The defendant's double jeopardy claim under the Federal Constitution must fail.

*Affirmed.*

All concurred.